UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHARRELLE HIGGINS )<br> )<br> Plaintiff, )<br> )<br> v. )<br> )<br>INSPECTOR GENERAL, )<br>United States Department of )<br>Housing and Urban Development )<br> )<br> Defendant. )<br> ) | Civil Action No. 10-cv-2027 (ESH) |

## MEMORANDUM OPINION

Plaintiff Sharrelle Higgins has sued the Office of Inspector General ("OIG"), United States Department of Housing and Urban Development ("HUD"), under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e *et seq*. She alleges that, because of her race (African-American) and sex (female), she was not selected for the position of Deputy Assistant Inspector General ("DAIG"). Defendant now moves to dismiss or, in the alternative, for summary judgment. For the reasons stated below, defendant's motion for summary judgment will be granted.

## BACKGROUND

**I. FACTS**

Higgins was hired by OIG[1] in 2004 as Deputy Director of Human Resources. (Compl. ¶¶ 5, 7; Pl.'s Opp'n to Def.'s Mot. to Dimiss, Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. 1 ("Higgins

---

[1] The OIG is a unit within HUD that consists of four divisions: Office of Audit, Office of Investigations, the Office of Legal Counsel,and the Office of Management and Policy (OMAP). OMAP consists of six subdivisions: Human Resources, Administration, Budget and Financial

Application") at 2–3.)[2]  In October 2005, Helen Albert, then serving as DAIG, promoted plaintiff to become Director of Human Resources.  (Compl. ¶ 7; Def.'s Mot. to Dismiss, Mot. for Summ. J. ("Def.'s Mot."), Ex. 8 ("Albert Decl.") ¶¶ 2–3.)  From that time until she left OIG, Albert was her first line supervisor and Dennis Raschka, the Assistant Inspector General ("AIG"), was her second line supervisor.  (Id. ¶ 3; Def.'s Mot., Ex. D ("Raschka Decl.") ¶ 1.)  Raschka focused on day-to-day administrative operations while Albert focused on external affairs, including congressional and media relations.  (Raschka Decl. ¶ 3.)  Although Albert was her direct supervisor, Higgins interacted more with Raschka, who was her mentor.  (Def.'s Mot., Ex. A ("Higgins 1st Dep.") 104:2–104:11.)

In June 2009, Albert reclassified Higgins' position to make her the Director of OIG's Human Capital and Management Services, which gave her additional responsibilities to "round out her experience."  (Def.'s Mot., Ex. C ("Raschka Dep.") 92:2-92:22; Raschka Decl. ¶ 2.)  In this role, she assumed duties including contracting, procurement, and space management.  (Higgins 1st Dep. 23:20-26:14.)

In fall 2009, Raschka announced that he was planning to retire and that Albert would be promoted to AIG.  In November 2009, an announcement was circulated inviting applications for the newly vacant position of DAIG, which is a Senior Executive Service ("SES") position[3]  with oversight of a staff of 47.  (Def.'s Mot, Ex. 2 ("Vacancy Announcement") at 1.)   The

---

Management; Training; Program Integrity and Hotline; Congressional affairs and media support; and Information Systems.  (Def.'s Mot., Ex. B (OIG Organizational Chart).)

[2] Higgins' prior work experience was primarily in personnel and human resources.  (Higgins Application at 2–8.)

[3] The SES is a corps of career-appointed executives who provide strategic leadership and management in the public sector.  *See* Office of Personnel Management ("OPM"), Welcome to the Senior Executive Service, www.opm.gov/ses/index.asp.

announcement described the DAIG's responsibilities, to include: coordinating strategic and contingency planning; overseeing the development of administrative and management reports (such as the mandatory semiannual report to Congress); directing assessments of OIG programs, policies, and procedures; providing management and leadership with respect to the budgetary process; overseeing OIG's procurement and contracting functions; providing leadership over all information technology policies and practices, human resources issues, and the program integrity (hotline) function; and overseeing congressional relations and public affairs, including external relations for OIG. (*Id*. at 1–2.) Because external relations had become so important to OMAP during Albert's tenure as DAIG (Raschka Decl. ¶ 3), Albert modified the draft announcement to ensure that congressional relations were identified as a key element of the position. (Def.'s Mot., Ex. E ("Farrior Decl.") ¶ 3.)

The requisite qualifications included executive-level leadership and management skills,[4] as well as demonstrated ability in position-specific areas. (*See id*. at 2–6.) Applicants were also required to show competency in a wide range of management support areas, including strategic planning and performance management and reporting, budget, procurement, contracting, space and property management, human resources management, training, information technology management, equal employment opportunity, program integrity, and matters involving congressional relations; leading the planning, managing, implementing, and directing of management and administrative support activities; and in meeting and reaching consensus on complex issues with individuals, groups, and high level officials. (*Id*. at 2–3.)

---

[4] All SES members must demonstrate the five Executive Core Qualifications ("ECQs"), which include the ability to lead change, the ability to lead people, being results driven, having business acumen, and building coalitions. (*See* Vacancy Announcement at 2.)

3

Applications that met the minimum qualifications were passed on to the Executive Review Board ("ERB") for ranking. [5] (*See* Farrior Decl. ¶¶ 3, 4; Exh. 3 (Instructions to ERB).) The ERB panel consisted of Raschka; Lester Davis, DAIG for the Office of Investigations; and Brenda Patterson, DAIG for the Office of Audit. (Farrior Decl. ¶ 4.) The applicants who the ERB rated as "best qualified" were interviewed by Raschka and Albert.[6] (*Id.* ¶ 7.) Among the "best qualified" were Higgins and Frank Rokosz, a Caucasian male who was then the Assistant Director at the OIG's Technical Oversight and Planning Division within the Office of Audit. (*Id.*) In addition to interviewing the candidates, Albert also spoke to their colleagues. (*See* Def.'s Mot., Ex. 6 ("Albert Aff.") at 6–7.)

In January 2010, Albert selected Rokosz as DAIG. (*Id.* at 8.) Inspector General Stephens subsequently concurred in her selection. (*See* Def.'s Mot., Ex. 9 (Merit Staffing Certificate); Pl.'s Opp'n, Ex. 14 ("Stephens Dep.") 46:16–46:19, 49:19–50:3; Raschka Dep. 93:7–93:19; Pl.'s Opp'n, Ex. 19 ("Albert Dep.") 44:15–44:18; *see also* Def.'s Mot., Ex. K ("Matthews Decl.") ¶ 7.) Albert personally told Higgins that she had not been selected (Albert Aff. at 7), and Stephens sent an email to all OIG employees informing them that Rokosz had been chosen. (*See* Pl.'s Opp'n, Ex. 21 at 12.) [7]

After Rokosz' selection, Higgins left her position in OIG. (Albert Aff. at 14.) On November 24, 2010, she filed suit, claiming that she was discriminated against on the basis of

---

[5] Tim Hathaway, at the Bureau of Public Debt, collected the applications and sent all that demonstrated minimum qualifications to Laura Farrior, Higgins' subordinate and friend. (Farrior Decl. ¶¶ 1, 3, 4.) Farrior sent these applications to the ERB. (*Id.*)

[6] Although the record is unclear as to whether one of the eight "best qualified" applicants was ultimately interviewed, since the form does not indicate the date of the interview (*see* Pl.'s Opp., Ex. 12 at 2), this is irrelevant to plaintiff's claim.

[7] Rokosz' application was reviewed by the Qualifications Review Board of OPM and he was found qualified for SES membership. (*See* Def.'s Mot., Ex. H (OPM submission); Def.'s Mot., Ex. P (certification notice).).

her race and gender when she was not promoted to be DAIG. Following a period of discovery, defendant filed the instant motion to dismiss or, in the alternative, for summary judgment.

## ANALYSIS

I.  **STANDARD OF REVIEW**

   A.  **Summary Judgment**

A motion for summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). There is a "genuine issue" of material fact if a "reasonable jury could return a verdict for the nonmoving party." *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at 248). A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). However, the non-moving party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-2397, 1998 U.S. Dist. LEXIS 22376, at **7–8 (D.D.C. Mar.

31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 U.S. App. LEXIS 25165 (D.C. Cir. Sept. 27, 1999).

### B.     Title VII

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The "two essential elements" of a discrimination claim under this section are "that (1) plaintiff suffered an adverse employment action (2) because of the plaintiff's race . . . [or] sex." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

In the absence of direct evidence of discrimination or retaliation, Title VII claims are assessed under a burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802-03 (1973). Pursuant to that framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). To establish a prima facie case of discrimination, Higgins must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (internal quotation marks omitted).

Once the plaintiff has made a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [challenged employment action].'" *Id*. (quoting *McDonnell Douglas*, 411 U.S. at 802). However, the D.C. Circuit has stressed that once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court must simply determine whether the plaintiff has put

forward enough evidence to defeat the proffer and support a finding of retaliation. *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.").

## II.    SUBJECT MATTER JURISDICTION

Plaintiff has sued the Inspector General of OIG in his official capacity. Title VII provides a cause of action against "the head of the department, agency, or unit." 42 U.S.C. § 2000e-16(c). Under Title VII, an "agency" is "an Executive department, a government corporation, [or] an independent establishment." 5 U.S.C. § 105. The "Executive department[s]" are statutorily defined and include HUD. *See* 5 U.S.C. § 101. "Independent establishment[s]" are not listed, but are defined as any "establishment in the executive branch . . . which is not an Executive department." 5 U.S.C. § 104(1).

Defendant argues that this Court lacks subject matter jurisdiction because plaintiff has named the Inspector General as defendant rather than the Secretary of HUD. (Def.'s Mot. at 15; Def.'s Reply to Opp'n to Mot. for Summ. J. ("Def.'s Reply") at 3–4.) It is true that the head of HUD—the executive department—is Secretary Shaun Donovan and the Inspector General is head of OIG, which is an office within HUD. However, despite being located in an "Executive department," the OIG is also an "independent establishment." *See United States Dep't of Justice v. Fed. Labor Relations Auth.*, 39 F.3d 361, 365-66 (D.C. Cir. 1994) ("The Inspector General's Office plainly qualifies as an 'agency' because it is an 'independent establishment' . . . [though may be] viewed as simultaneously 'in' the parent 'agency,' the Department of Justice.") (quoting

7

5 U.S.C. § 104(1)).  Applying this reasoning, the Court has subject matter jurisdiction over the instant suit.[8]

### III.   PLAINTIFF'S NON-SELECTION FOR DAIG POSITION

Plaintiff contends that she was not selected as DAIG because race and gender discrimination occurred at all three stages of the selection process: during the initial screening when Rokosz was deemed minimally qualified; during the ERB rating process; and in the final selection, when he was chosen to be DAIG.  (Pl.'s Opp'n at 5, 20.)  In response, defendant argues that there was a legitimate, non-discriminatory reason that Higgins was not selected to be DAIG: Rokosz was better qualified for the position.  (Def.'s Mot. at 2, 17–25.)

Rokosz and Higgins were both strong candidates.  At the initial screening stage, both applications were deemed minimally qualified and passed on to the ERB for consideration.  (Farrior Decl. ¶¶ 3– 4.)  They received exactly the same score from the ERB panel: they were rated "very strong" by two of the ERB reviewers (Raschka and Patterson) and "strong" by the third (Davis).  (*Id.* ¶ 6.)[9]  Both made the "best qualified" list, and their names were sent to Albert and Raschka.  (*Id*. ¶¶ 7–8.)  At the conclusion of the interviews, Raschka thought they were neck-and-neck, telling Higgins that she had a fifty-fifty chance of getting the position.  (Raschka

---

[8] Moreover, plaintiff consents to substituting Secretary Donovan as defendant.  (Pl.'s Opp'n at 27–28.)  Therefore, even if the Inspector General were not a proper defendant, this Court would permit plaintiff to substitute the Secretary of HUD.

[9] Higgins asserts that she should have scored higher than Rokosz and speculates that he received undeservedly high ratings because "senior staff" told the ERB reviewers to ensure that Rokosz was "within reach of selection."  (Pl.'s Opp'n, Ex. 6 ("Higgins 2nd Dep.") 59:10–60:24.)  There is absolutely no evidence to support this allegation and much that contradicts it, since he was found qualified by numerous reviewing entities within HUD.  (*See, e.g*., Farrior Decl. ¶ 8; Def.'s Mot., Ex. 4 (ERB Rating Sheet); Def.'s Mot., Ex. P (OPM Certification).)  Moreover, even if, as she contends, she should have scored higher than Rokosz, it would not have been material to the selection process. (Farrior Decl.  ¶ 6.)  The names of Rokosz, Higgins, and the six other "best qualified" applicants were sent, without their ERB scores, to Albert and Raschka for the interview stage.  (*Id*. ¶¶ 6–8.)

Decl. ¶ 5.) Albert, however, thought that Rokosz outperformed Higgins at the interview: her interview notes describe Rokosz as "excellent," with "great experience with programs and dealing with people" and indicate that Higgins' relations with other OMAP staff were "still a concern as other staff have come forward regarding these issues." (Def.'s Mot., Ex. 7 ("Albert's Interview Notes") at 2, 6.)  After the interview, another OMAP director approached Raschka to raise concerns about Higgins' ability to interact with her peers, which caused him to also question her ability to work with others. (Raschka Dep. 74:7–74:12; *see also* 75:18–76:3; 78:2–78:22, 91:4–91:18).

After considering the candidates' work experience, interview performance, and discussions with the candidates' colleagues, Albert selected Rokosz.  She chose him because of his experience within HUD, private industry and the military, work with the media and in preparing congressional testimony; key roles in major audits; and the unanimously good reports from colleagues. (Albert Aff. at 7–8, 11–12.)  According to Albert, Higgins was not chosen because her experience and role within OIG was limited; her previous work was primarily human resources-related; she lacked experience in several areas, including congressional and media relations, which Albert considered to be critical; and there was negative feedback about her ability to get along with her colleagues. (*Id*. at 7–8.)

Since defendant has provided a legitimate and non-discriminatory explanation for its decision to select Rokosz, the burden now shifts back to plaintiff and "'the only question is whether [her] evidence creates a material dispute on the ultimate issue of [discrimination].'" *McGrath v. Clinton*, 666 F.3d 1377, 1380 n.3 (D.C. Cir. 2012) (quoting *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009)); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012).

## IV.     PRETEXT

### A.     Selection Process

Plaintiff appears to argue that a jury could infer discrimination in both the initial screening and the ERB review stage. (Pl.'s Opp'n at 5.) She insists that the process must have been flawed because Rokosz should not have made the minimally qualified list during the screening stage, the "best qualified" list during the ERB review stage, and should not have received an ERB rating equal to hers. (Pl.'s Opp'n at 5.) The only support she offers is her own uninformed opinion about the relevance of Rokosz' experience and her subjective assessment of her abilities. (*See* Higgins 2nd Dep. 52:3–56:13.)

The record, however, indicates otherwise. It appears—and plaintiff does not dispute—that the selection process functioned normally and complied with agency procedures. (*Compare* Farrior Decl. ¶¶ 2–8 *with OPM*, *Guide to SES Qualifications Manual* 4–7 (2010).) Moreover, the adequacy (indeed strength) of Rokosz' qualifications for the DAIG position have been reaffirmed by multiple different actors within OIG, including one person who is a personal friend of Higgins (Farrior Decl. ¶ 1; Higgins 1st Dep. 129:2–129:09) and various people against whom Higgins makes no claim of discrimination. (*See id*. 155:2–155:4 (denying claims against Raschka); Higgins 2nd Dep. 13:14–13:18 (denying claims against Farrior or Hathaway)). Therefore, there is absolutely no basis to infer that something "fishy" occurred. *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 508–09 (D.C. Cir. 2005).

### B.     Relative Qualifications

Plaintiff focuses primarily on the final stage of the DAIG selection, arguing that defendant's reason for choosing Rokosz is pretextual because she was "significantly more qualified" than Rokosz. (Pl.'s Opp'n at 22–25.) However, her estimation of their relative qualifications is based on limited knowledge of Rokosz' experience, a narrow conception of the

skills necessary for an executive-level position, and her own assessment of her qualifications (*see id*; Higgins 2nd Dep. 52:3- 56:13), which is insufficient. *See Vatel v. Alliance of Automobile Manuf.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("It is settled that 'it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'") (quoting *Hawkins v. PepsiCo., Inc.*, 203 F. 3d 274, 280 (4th Cir. 2000).

In a non-selection case, a plaintiff can satisfy her burden of persuasion by showing that "a reasonable employer would have found the plaintiff to be significantly better qualified for the job." *Calhoun v. Johnson*, 632 F.3d 1259, 1263 (D.C. Cir. 2011) (quotation marks and citation omitted). To do so, she must present evidence of "stark superiority of credentials over those of the successful candidates." *Stewart v. Ashcroft*, 352 F.3d 422, 429–30 (D.C. Cir. 2003)); *see also Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) ("[I]n order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination.") (quotation marks and citation omitted). Absent such a gap, courts "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

Higgins' central claim is that her OMAP-related experience made her better qualified than Rokosz, who had never worked in OMAP. (Pl.'s Opp'n at 10–12, 22–25.) However, OMAP-related experience was not a pre-requisite for the job (*see Gilbert v. Napolitano*, No. 11-5053, 2012 U.S. App. LEXIS 4277, at *13 (D.C. Cir. Mar. 2, 2012)),[10] and in fact, others who had held the job did not have experience in OMAP. As Albert testified, she had not worked

---

[10] *See* Vacancy Announcement; *see also OPM, Guide to SES Qualifications* at 1 (2010), *available at* http://www.opm.gov/ses/references/GuidetoSESQuals_2010.pdf (specifically seeking executives "whose commitment to public policy and administration transcends their commitment to a specific agency mission or an individual profession").

within OMAP before assuming the DAIG position.  (Albert Aff at 2, 11.)  Nor, for that matter, had either of the successors to the DAIG position— Frank Rokosz or the current DAIG, Ruth Ritzema.  (Raschka Decl. ¶ 4.)  Understandably, this may be a consequence of the fact that, though OMAP experience is useful, it is not as desirable as experience in other OIG work since the DAIG implements OIG-wide programs.  (*See* Albert Aff. at 12.)  Raschka, who, like Rokosz, came from an auditing background, confirmed the importance of this experience for a DAIG.  (Raschka Dep. 101:03-101:20).  While Higgins had OMAP experience, she lacked virtually *any* experience with non-OMAP offices, including auditing and investigations, which are the most important functions within OIG.  (Albert Aff. at 7–8; Raschka Dep. 42:01–48:15; 81:4–81:10 (explaining that Higgins' interaction with other offices was limited to human resources issues)).

Although Higgins had more experience with human resources, that was only one of the many areas of required competence listed in the vacancy announcement.  (*See supra* pp. 2–3.)  In at least three areas identified on the vacancy announcement, Higgins could not compare with Rokosz: dealing with the media and Congress;[11] building coalitions, leading people, and reaching consensus on complex issues; and establishing working relationships with colleagues and subordinates.  (Albert Aff. at 7–8.; *see also* Raschka Decl. ¶¶ 3, 7.)[12]  Albert's contemporaneous

---

[11] In her opposition, Higgins contends that she also has demonstrated experience in congressional and media relations.  (Pl.'s Opp'n at 13, 22.)  This, however, is not supported by the record.  Her experience in this area is limited to preparing information on human resources that may or may not have made it into Secretary Donovan's testimony and she has had no direct contact with the media.  (Higgins 1st Dep. 84:01-87:13.)  Rokosz, by contrast, had significant direct contact with congressional staff and media personnel and had even won an award for his work.  (Def.'s Mot., Ex. 5 ("Rokosz Application") at 1, 6, 9, 14; Albert Aff. at 12.)

[12] Contrary to plaintiff's contention (Pl.'s Opp'n at 16–17), there is no material dispute of fact regarding Albert's assessment of her ability to interact with colleagues.  Indeed, OIG Ombudsman Matthews testified that "the friction in the workplace created by Ms. Higgins was known by [Albert and Raschka.]"  (Matthews Decl. ¶ 7.)  In fact, Higgins acknowledged this weakness in her interview with Albert.  (*See* Albert's Interview Notes at 2, 6.)  The prior favorable performance assessments of Higgins do not undercut the fact that Raschka and Albert

notes evidence her view that Rokosz had demonstrated ability in all of the required areas except human resources and that he had "great experience . . . with dealing with people." (Albert's Interview Notes at 1, 4; Albert Aff. at 8.) Albert's notes from Higgins' interview, by contrast, indicate that she thought that Higgins lacked experience in multiple areas, and she was concerned about Higgins' relationship with other OMAP staff given that staff had approached her with complaints.[13] (Albert's Interview Notes at 2, 6.) Therefore, there is no reason to doubt Albert's conclusion about the candidates' relative qualifications. *Cf. Hamilton*, 666 F.3d at 1355–57) (emphasizing the evidentiary weight of contemporaneous notes and focus on objective criteria listed in vacancy announcement).

At a minimum, a comparison of their work experience shows that Rokosz was at least as qualified as Higgins. Rokosz had over twenty years of experience within OIG and ten years of experience as a supervisor (Rokosz Application at 5, 9; Albert Dep. 68:14–68:17), whereas Higgins had only six years of experience within OIG and six years of experience as a supervisor. (Higgins Application at 3–5). Rokosz managed large groups of people and implemented projects in cooperation with external actors (Rokosz Application at 5–8, 15–16, 19–22; Albert Aff., at 8, 11–12; Albert Dep. 68:14–68:17), while Higgins oversaw a small office focused on internal human resources support. (*See* Albert Decl. ¶ 6; Raschka Dep. 43:2–45:18, 47:2–47:20

---

received complaints from Higgins' colleagues (and some were more recent than the performance assessments). (*See* Albert Dep. 48:20–48:23, 54:21–55:14; Raschka Dep. 74:3–74:16; 75:22–79:2; 90:9–91:18; Matthews Decl. ¶ 6 (documenting numerous complaints about Higgins).) Even if, as Higgins asserts (Pl.'s Opp'n at 21), Albert and Raschka discounted some of the complaints, her record in this regard still cannot compare with Rokasz' unblemished peer reviews.

[13] Plaintiff's argument that Brian Howell, another OIG SES selectee, was the subject of complaints (Pl.'s Opp'n at 16) is utterly irrelevant. There is no evidence that the selecting officials in his case knew of any complaints, no indication of the other applicants' qualifications, and it was not the same selecting official. (*See id.*)

(explaining that Higgins did not do strategic planning or budgeting).) Rokosz had participated in five congressional hearings that year alone, had received an award for his participation in congressional hearings, and had participated in interview with reporters from numerous major newspapers. (Rokosz Application at 5, 9, 15-16; Albert Dep. 68:2–68:22.) Higgins, by contrast, had no contact with congressional staff and extremely limited experience in preparing congressional testimony (*see supra* note 11) or with the media. (Higgins 1st Dep. 85:22-87:9.) Moreover, Rokosz, unlike Higgins (*see supra* note 12), had an established record of successfully managing people and developing lines of communication within and outside his organization.[14] (Albert Aff. at 8; Rokosz Application at 15-16 (discussing how he handled the collapse of the single-family merger market).)

Given this undisputed evidence, Higgins was not "*significantly* better qualified" than Rokosz. *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (internal quotation marks omitted). In fact, it may not have been a close call. But, even if it were, that would not defeat summary judgment. *Stewart*, 352 F.3d at 430; *see also Aka*, 156 F.3d at 1294. Given the absence of evidence of pretext, "the court must respect the employer's unfettered decision to choose among qualified candidates." *Fischbach*, 86 F.3d at 1183.

C.   **Other Evidence**

A plaintiff attacking an employer's reason is of course not limited to comparing his qualifications against those of the successful candidate and "can also attempt to show by other means that the explanation was made up to disguise illegitimate bias." *Aka*, 156 F.3d at 1295,

---

[14] Despite plaintiff's assertions (Pl.'s Opp'n at 9, 22), the fact that she was one of a number of people who "acted as" DAIG when Albert was away does not prove that plaintiff was better qualified than Rokosz. Acting DAIGs were chosen based on their availability when an expected absence was to occur. (*See* Albert Aff. at 12.)

1299.  Despite a substantial record, however, there is not a shred of evidence that unlawful bias played a role in this decision.

Although plaintiff devotes much space to her claim that Stephens, not Albert, made this selection, she nonetheless fails to provide any evidentiary support for this assertion.  (*See* Pl.'s Opp'n at 14–15, 27.)  On the contrary, the record demonstrates convincingly that it was Albert alone who made this decision and that she did not receive direction from Stephens.  (Albert Aff. at 16–17; Raschka Decl. ¶ 6; Raschka Dep.  68:4–68:8; Stephens Dep. 49:19–50:03.)[15]  Since plaintiff has not provided evidence to support her conjecture, her "own self-serving statements . . . are insufficient to defeat summary judgment."  *Klayman v. Judicial Watch Inc*., 628 F. Supp. 2d 142, 148 –49 (D.D.C. 2009).   And, in any case, it is irrelevant because the identity of the decisionmaker does not rebut defendant's reason for choosing Rokosz.

This renders irrelevant plaintiff's argument that other complaints of discrimination may have any bearing on the instant case.  (*See* Pl.'s Opp'n at 18, 20.)  It is true that, in some cases, evidence of prior acts may be admissible to show discriminatory motive or intent.  *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008).  However, plaintiff's vague allusions to other discrimination cases, none of which have to do with Albert, are not probative here.  *See id.* (explaining that the inquiry "depends on . . . how closely related the evidence is to the plaintiff's circumstances and theory of the case"); *see also Wade v. Washington Metro. Area Transit Auth*., No. 01-2006 U.S. Dist. LEXIS 16447, at **6–14 (Apr. 5, 2006) (explaining that evidence of prior acts may be probative of motive or intent "if the discrimination is of the same character and

---

[15] As Raschka confirms, there was no directive from higher-level OIG supervisors to avoid selecting Higgins; if there had been, he would not have initially evaluated Higgins' chances as "fifty-fifty" (*see* Raschka Decl. ¶ 5) and, if they had wanted to simply avoid promoting her, OIG hiring procedures would have allowed them to dispense with the interview stage entirely and simply hired one of the eight applicants on the "best qualified" list.  (*Id.*; Farrior Decl. ¶ 7.)

type as that... alleged") (internal quotation marks omitted). Albert selected Rokosz, without input or direction from Stephens, and the other complaints show nothing about her motive.

On the contrary, the record shows that in October 2005, Albert promoted Higgins to the position of Director of Human Resources. (Albert Decl. ¶ 3; Raschka Dep. at 92:2–92:6.) Then, in June 2009, she realigned divisions to allow Higgins to gain broader experience beyond the human resources realm. (*Id*. at 92:7-92:11.) This not only makes it difficult to impute discrimination to Albert's decision a mere six months later, *see Vatel*, 627 F.3d at 1247, but also supports Albert's explanation that Higgins' experience was limited.

Finally, in an attempt to salvage her case, Higgins argues that there is a dispute of fact as to Albert's credibility based on insignificant discrepancies in the extensive record. (*See* Pl.'s Opp'n at 17-18.) Higgins fails to recognize, however, that "factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson*., 477 U.S. at 248).[16] Here, there is no basis to doubt Albert's credibility simply because she initially did not remember one unimportant interaction with Stephens. (Pl.'s Opp'n at 17.) Similarly, there is no reason to doubt Albert's credibility because she could not clarify the extent of Higgins' negligible experience in congressional relations beyond "little experience or none." (*Id*.) Nor is there support for plaintiff's contention that Albert has given materially different explanations for Rokosz' selection. (*Id*.) Higgins insists that she was told that Rokosz had more experience in HUD programs and Albert says that she simply said "programs," but meant that he had more

---

[16] *Holcomb*, 433 F.3d at 895 (explaining that "[a] fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law") (quoting *Anderson*, 477 U.S. at 248); *Gorence v. Eagle Food Ctrs., Inc*., 242 F.3d 759, 763 (7th Cir. 2001) ("And it is simply not true, we want to emphasize, that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero.").

experience in OIG programs (Albert Aff. at 11). Regardless, Rokosz has more experience in both, both are relevant for DAIG duties, and this does not establish that Albert is not credible. (*Id.*)

Where, as here, there is no evidence of discrimination or pretext, the Court must "'assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Adeyemi*, 525 F.3d at 1227 (quoting *Aka*, 4156 F.3d at 1294).

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment. A separate order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:   April 3, 2012